UNITED STATES DISTRICT COURT
DISTRICT OF MINNESTOA

| | |
|---|---|
| Boston Scientific Corporation,<br><br>   Plaintiff,<br><br>v.<br><br>Albert Sprenger, JR, and St. Jude<br>Medical S.C., Inc.,<br><br>   Defendants. | Civ. No.12-1124 (DWF/JJK)<br><br><br>**ORDER** |

This matter is before the Court on Plaintiff Boston Scientific Corporation's Motion to Enforce the Settlement Agreement (Doc. No. 11). On October 16, 2011, the Court held a hearing and heard oral argument on Plaintiff's motion. Based on the file, and all the records and proceedings herein, **IT IS HEREBY ORDERED** that:

  1. Plaintiff's Motion to Enforce the Settlement Agreement (Doc. No. 11) is **DENIED**; and

  2. The attached Memorandum is hereby incorporated in this Order.

Date: November 8, 2012

                *s/ Jeffrey J. Keyes*
                JEFFREY J. KEYES
                United States Magistrate Judge

**MEMORANDUM**

*General Background*

Up until March 2012, Plaintiff Boston Scientific Corporation ("Boston Scientific"), a medical device manufacturer, employed Defendant Albert Sprenger, JR ("Sprenger"), as a sales representative. In the years leading up to March 2012, Sprenger sold cardiac rhythm management ("CRM") devices for Boston Scientific in the greater metropolitan area in and around Cleveland, Ohio. But in March 2012, Sprenger left Boston Scientific's employment and went to work for Defendant St. Jude Medical S.C., Inc. ("St. Jude"), one of Boston Scientific's competitors. When he was employed by Boston Scientific, Sprenger signed a non-compete agreement with Boston Scientific that limited the competitive sales activities Sprenger was permitted to engage in for a period of one year after his separation from Boston Scientific.

Shortly after Sprenger left Boston Scientific, his former employer commenced this action alleging, among other things, that Sprenger violated that non-compete agreement almost immediately after he joined St. Jude. Before Sprenger or St. Jude answered Boston Scientific's Complaint, the parties reached a Confidential Settlement Agreement. In the Settlement Agreement, the parties again agreed that Sprenger would be restricted from having any involvement in CRM-related sales, marketing, and promotion for a period of one year. They clarified, however, that this restriction on Sprenger's CRM-related sales activities does not apply to sales, marketing, or promotional activities

concerning St. Jude's atrial fibrillation ("AF") devices or services. The parties' current dispute concerns the interplay between the preservation of Sprenger's right to engage in AF-related sales work and the restriction of his ability to engage in any CRM-related activities.[1]

### *Boston Scientific's Motion*

Boston Scientific has moved to enforce the Settlement Agreement, and seeks injunctive relief and costs on the grounds that Sprenger has allegedly violated the Settlement Agreement by improperly engaging in restricted CRM-related activities. Boston Scientific claims that Sprenger most recently violated the Settlement Agreement on August 20, 2012, by attending a promotional event in Toledo, Ohio, hosted by St. Jude. At the Toledo event, an electrophysiologist delivered a presentation entitled "Quadripolar Technology: The New Frontier in Cardiac Resynchronization Therapy (CRT) and Heart Failure (HF) Management." St. Jude invited doctors from the nearby Toledo Hospital and other area hospitals to attend the event. Toledo Hospital is one of the specific accounts to which Sprenger sold Boston Scientific's CRM devices before he left to join St. Jude. Boston Scientific asserts that the Toledo event focused on cardiac resynchronization therapy ("CRT"), and that focus places it squarely within the

---

[1] In the Order of Dismissal entered by United States District Judge Donovan Frank that followed the Settlement Agreement, the Court retained jurisdiction over this action for one year. (Doc. No. 7.) Judge Frank also referred any disputes relating to the resolution of the case to the undersigned for disposition. (*Id.*)

3

CRM-related sales activities Sprenger cannot engage in under the terms of the Settlement Agreement.

Before Sprenger attended the Toledo event, Boston Scientific asserts that Sprenger also violated the Settlement Agreement provision by flying to a St. Jude marketing event in Austin, Texas, with Dr. James Ramicone. Dr. Ramicone is one of the customers to whom Sprenger sold Boston Scientific's CRM products. Boston Scientific states that, while he was in Austin, Sprenger attended seminars relating to AF treatments with Dr. Ramicone. According to Boston Scientific, CRM-related topics apparently came up at those seminars. When that happened, Sprenger supposedly left the room. Boston Scientific contends that this type of behavior "aggressively blur[s] the line between prohibited and permitted conduct" under the Settlement Agreement. And Boston Scientific alleges that Sprenger is using his ability to engage in ostensibly AF-related sales activities as a pretext to trade on the CRM-related goodwill he developed with physicians during his employment with Boston Scientific.

To remedy these alleged violations of the Settlement Agreement, Boston Scientific asks the Court to enjoin Sprenger from engaging in any CRM-related sales activities through August 20, 2013. It asserts that because Sprenger's most recent violation of the agreement occurred on August 20, 2012, it has deprived it of the benefit of the one-year non-compete provision. Boston Scientific also requests that the Court enjoin Sprenger from engaging in any AF-related sales activities. It claims this additional restriction is needed because

4

Sprenger's aggressive blurring of the line between permitted and prohibited conduct shows that Sprenger will use nominally AF-related activities as a ploy to engage in prohibited CRM-related conduct, thereby depriving Boston Scientific of the intended benefits of the Settlement Agreement.

### *Defendants' Opposition to Boston Scientific's Motion*

Defendants contend that neither Sprenger's attendance at the August 20, 2012 Toledo presentation, nor at St. Jude's marketing seminars in Austin, violated the Settlement Agreement. In support of this position, Defendants present largely unrebutted evidence concerning the nature of CRM, CRT, and AF devices, and how they can be used alongside one another in treating certain patients with heart conditions. CRM devices, Defendants explain, typically include things such as pacemakers, defibrillators, and CRT devices. (Doc. No. 38, Decl. of Mark Carlson, M.D. ("Carlson Decl.") ¶ 8.) These implantable CRM devices can be used to treat heart rates that are too slow or too fast (pacemakers and defibrillators) and certain kinds of heart failure (CRT devices). (*Id.* ¶ 9.) AF devices, on the other hand, are not implantable, and are used to diagnose and treat certain kinds of heart failure. They include large diagnostic machines called "mapping devices," as well as radiofrequency generators and "ablations catheters," the latter of which are used to remove heart tissue that causes abnormal heart rhythms. (*Id.* ¶¶ 11–13.)

Defendants further explain that patients who suffer from heart failure or from reduced left ventricle function may also have atrial fibrillation. (Carlson

Decl. ¶¶ 9–10.) Atrial fibrillation involves the upper chamber of the heart quivering "in a disorganized pattern rather than in a controlled rhythmic beat." (*Id.* ¶ 15.) These kind of arrhythmic disorders of the heart can sometimes be treated with CRM devices, sometimes with AF devices, sometimes with pharmaceuticals, and sometimes with all three of these measures or some other combination thereof. (*Id.* ¶ 7.) For example, heart failure can be treated with implantation of a CRT device, and a physician may use an AF device to diagnose and treat atrial fibrillation symptoms in the same patient. (*Id.* ¶ 17.) Thus, CRM devices and AF devices are sometimes complimentary and occasionally the use of both is medically necessary. (*See id.* ¶ 20.)

This overlapping of treatments, Defendants urge, explains how Sprenger could permissibly attend the two events Boston Scientific believes violated the Settlement Agreement. Because the Toledo event dealt not only with CRT treatments, but also with heart failure, which can be treated by AF devices, Defendants assert that Sprenger had a legitimate AF-related reason to be there. And because the Settlement Agreement allows Sprenger to engage in all manner of AF-related sales activities, Defendants claim, his attendance at the Toledo event did not violate the Settlement Agreement. Similarly, with respect to the Austin event, Defendants assert that Boston Scientific has failed to show that Sprenger violated the Settlement Agreement by traveling to the event and interacting with Dr. Ramicone, despite the fact that CRM issues came up at the seminars. Indeed, Defendants insist the Settlement Agreement allows Sprenger

6

to interact with physicians, such as Dr. Ramicone, to whom he formerly sold Boston Scientific's CRM devices, so long as those interactions are solely limited to the selling, marketing, or promoting of St. Jude's AF-related devices.

Defendants also present evidence that Sprenger observed the delineation between permitted AF-related activities and prohibited CRM-related conduct while attending both the Toledo and Austin events. At the Toledo event, for example, Dr. Ransford Brenya, an electrophysiologist working in the Toledo area saw Dr. Sprenger. (Doc. No. 39, Decl. of Dr. Ransford Brenya ("Brenya Decl.") ¶¶ 2, 11–12.) Dr. Brenya sat at the same table as Sprenger, and when another physician began discussing a CRM-related issue, Sprenger told everyone there that he was bound by a non-compete to disengage himself from such matters. (*Id.* ¶ 14.) Dr. Brenya says that Sprenger never discussed or offered to discuss any CRM-related products with him that evening, but instead discussed one of St. Jude's AF systems used to create maps of the internal structure of the heart. (*Id.* ¶¶ 15, 16.) Dr. Daniel Buerkel, another electrophysiologist working in the Toledo area, tells the same story. (Doc. No. 40, Decl. of Dr. Daniel Buerkel, M.D. ("Buerkel Decl.") ¶¶ 2, 11–16.)

Defendants also assert that Sprenger drew lines between permitted and prohibited conduct at the Austin event. Dr. Ramicone, who is an electrophysiologist working in the Cleveland area, and who treats patients who have heart failure including atrial fibrillation, explains that Sprenger was, in fact, on the same flight that the doctor took to Austin in July to attend St. Jude's

7

educational seminars. (Doc. No. 41, Decl. of Dr. James Ramicone ("Ramicone Decl.") ¶¶ 2, 14–16.) Dr. Ramicone also says that the educational sessions at the Austin event were divided between AF and CRM modules. (*Id.* at 18.) He further states that Sprenger did not attend any of the CRM modules, told Dr. Ramicone that he was unable to participate in the CRM sessions, and did not discuss any CRM-related issues with Dr. Ramicone during the trip. (*Id.* ¶¶ 18–19.) Sprenger's compartmentalization of his role in AF sales at the Toledo and Austin events, Defendants assert, further demonstrates that he has not violated the Settlement Agreement as Boston Scientific alleges.

## DISCUSSION

**I. Legal Standard**

Boston Scientific's motion requires the Court to decide whether Sprenger violated the Settlement Agreement, and that inquiry begins with the proper interpretation of the agreement's language. "A settlement agreement is essentially a contract, subject to contractual rules of interpretation and enforcement." *Ridgecliffe Second Assoc. v. Boutelle*, No. C9-01-190, 2001 WL 1182404, at *2 (Minn. Ct. App. Oct. 9, 2001).[2] "The primary goal of contract

---

[2] In the Settlement Agreement, the parties agreed that "Minnesota substantive law . . . shall govern the determination of any . . . disputes" relating to or arising out of the Settlement Agreement. (Doc. No. 14, Pl.'s Ex. List for Mem. Supp. the Mot. to Enforce the Settlement Agreement ("Pl. Ex. List"), Ex. A at 4.) The parties do not dispute that the Court has authority to enforce the Settlement Agreement under its inherent power and as a result of the decision to retain jurisdiction to enforce the agreement's terms.

8

interpretation is to ascertain the intent of the parties." *Winthrop Res. Corp. v. Sabert Corp.*, 567 F. Supp. 2d 1084, 1091 (D. Minn. 2008) (citing *Motorsports Racing Plus, Inc. v. Arctic Cat Sales, Inc.*, 666 N.W.2d 320, 323 (Minn. 2003)).

The first step in interpreting a written agreement is to determine whether the contract is ambiguous. *Travertine Corp. v. Lexington-Silverwood*, 683 N.W.2d 267, 271 (Minn. 2004). If the language of a written contract is unambiguous, then courts discern the parties' intent from the plain language alone. *See Winthrop Res. Corp.*, 567 F. Supp. 2d at 1091 (citing *Alpha Real Estate Co. of Rochester v. Delta Dental Plan of Minn.*, 664 N.W.2d 303, 312–13 (Minn. 2003). If a contract is ambiguous, however, a court may look beyond the language of the agreement. *BP Prods. of N. Am., Inc. v. Twin Cities Stores, Inc.*, 534 F. Supp. 2d 959, 962 (D. Minn. 2007) (citing *Hous. & Redev. Auth. of Chisholm v. Norman*, 696 N.W.2d 329, 337 (Minn. 2005)). "A contract is ambiguous only if its language is reasonably susceptible to more than one interpretation." *Winthrop Res. Corp.*, 567 F. Supp. at 1091 (citing *Art Goebel, Inc. v. N. Suburban Agencies, Inc.*, 567 N.W.2d 511, 515 (Minn. 1997)). "In construing ambiguous contract language, [courts] consider the contract as a whole in light of the circumstances surrounding its formation, and strive to arrive at the parties' real understanding." *State ex rel Humphrey v. Phillip Morris USA, Inc.*, 713 N.W.2d 350, 355 (Minn. 2006).

## II. Analysis

### A. The Settlement Agreement's Non-Compete Language is Ambiguous

The non-compete language in Paragraph 7 of the Settlement Agreement restricts Sprenger's CRM-related sales activities, but limits the reach of that restriction with respect to his AF-related sales work for St. Jude. In relevant part, Paragraph 7 reads:

> 7. <u>Non-Compete:</u> . . . Sprenger and SJM [St. Jude Medical] also agree that for three hundred sixty five (365) days from the date of Sprenger's resignation from BSC, Sprenger shall not sell, solicit the sale of, support the sale of, support or supervise the sale or implantation or other use of, or otherwise have any involvement whatsoever with the sale, manufacturing, research, development, marketing or other business aspect of any cardiac rhythm management device, including pacemakers, implantable cardioverter defibrillators, cardiac resynchronization therapy defibrillators, and cardiac resynchronization therapy pacemakers, or any other Competitive Product as defined in Section 2(a) of the Non-Compete Agreement within the region defined in Exhibit 4, hereto. The foregoing restriction does not apply to any aspects regarding the sale, support or management of SJM atrial fibrillation devices or services.

(Pl.'s Ex. List, Ex. A at 3.)

This language is ambiguous. Cutting its broadest path in its first sentence, Paragraph 7's language restricts Sprenger from having "any involvement whatsoever with" any business aspect of CRM devices. But its second sentence expressly provides that the CRM restriction "does not apply to any aspects" of similar AF-related sales activities. On the one hand, it could be reasonable to conclude, as Boston Scientific argues, that the first sentence's restrictive

10

language supersedes Sprenger's ability to engage in AF-related sales activities. On that reading, Sprenger would violate the Settlement Agreement by engaging in AF-related sales work any time that work touched upon some business aspect of St. Jude's CRM devices. On the other hand, it would be equally reasonable to conclude, as Defendants urge, that the restriction on Sprenger's CRM-related sales activities "does not apply to any aspects" of Sprenger's AF-related sales work. As a result of that reading, Sprenger would be free to engage in his AF-related sales work even when those efforts involve some overlapping with St. Jude's CRM devices. Thus, the meaning of Paragraph 7 is pulled in opposite directions by these two sentences, and because the Court could reasonably apply either party's interpretation to the contract's language, the contract is ambiguous.[3] The Court's task in construing the agreement's ambiguous language is to "consider the contract as a whole in light of the circumstances surrounding its formation, and strive to arrive at the parties' real understanding." *State ex rel Humphrey*, 713 N.W.2d at 355.

### B. Boston Scientific has not shown that Sprenger violated the Settlement Agreement

From the language of the agreement and the circumstances surrounding its formation, the Court can infer that the parties held the following intentions.

---

[3] Contrary to Boston Scientific's argument that Sprenger's conduct has blurred the line between permissible and prohibited sales work under the Settlement Agreement (*see* Doc. No. 13, Pl.'s Mem. Supp. Mot. to Enforce the Settlement Agreement ("Pl.'s Mem.") 18), it is the language of the agreement Boston Scientific agreed to that rendered that line blurry.

11

The parties intended to protect Boston Scientific's interest in maintaining its goodwill with its existing CRM accounts for a one-year period. The parties also intended to prevent St. Jude from capitalizing on the investment Boston Scientific had made in Sprenger's sales activities to those CRM accounts during the time Sprenger worked for Boston Scientific. But that protection of Boston Scientific's interests was not absolute. The parties also intended for Sprenger to be able to earn a living during the period of the non-compete and that he could do so by selling St. Jude's AF devices. To achieve that end, the parties inserted language in the agreement providing that the restriction on Sprenger's sale of St. Jude's CRM products does not apply to any aspects of his AF-related sales work. The parties also intended to permit Sprenger to sell those AF devices to the same physicians he had previously developed relationships with while an employee of Boston Scientific. Thus, the parties understood that Sprenger would be able to take advantage of the relationships he built with physicians and hospitals in the region while he was employed by Boston Scientific, albeit with a different type of product.

It is also reasonable to infer that at the time they drafted Paragraph 7 all the parties to the Settlement Agreement understood that circumstances might arise in which Sprenger's sale of St. Jude's AF devices could intersect with some component of St. Jude's CRM business. It was in that context that Boston Scientific agreed to the language that the non-compete's restriction on Sprenger's CRM-related work does not apply to his sale of St. Jude's AF

devices.  Boston Scientific thereby entered a bargain that it should reasonably have foreseen would allow Sprenger to attend promotional events for the purpose of selling AF devices even though such an event might interrelate with CRM issues.

Boston Scientific argues that the contract's purpose requires a different conclusion.  It contends that the purpose of the contract was exclusively to give Boston Scientific the benefit of the original non-compete agreement that Sprenger allegedly violated before this lawsuit began.  (*See* Doc. No. 44, Pl.'s Reply Mem. in Supp. of Mot. to Enforce Settlement Agreement ("Pl.'s Reply") 6 (arguing that Defendants' interpretation would absurdly allow Sprenger to continue to engage in the conduct that gave rise to this lawsuit in the first place).)  But, as the Court's discussion above regarding the parties' intentions demonstrates, the overall purpose of the Settlement Agreement was not quite so one-sided.  Although Boston Scientific obtained Sprenger's promise that he would not engage in CRM-sales activities to bring an end to the lawsuit, it also agreed that Sprenger's promise to avoid any involvement with CRM-related issues "does not apply to any aspect" of his AF sales work.  Thus, in addition to protecting Boston Scientific's business interests, part of the Settlement Agreement's overall purpose was to ensure that Sprenger maintains a viable way to make a living.

This mutually beneficial purpose can be seen in the parties' other compromises as well.  Paragraph 7 of the Settlement Agreement extended the

13

geographical scope of Sprenger's non-compete to all of Boston Scientific's CRM accounts in the Cleveland and Toledo area. The original non-compete agreement between Sprenger and Boston Scientific arguably did not cover Toledo, and only applied to the accounts in Sprenger's own West Cleveland territory. In the underlying lawsuit, Boston Scientific claimed, however, that Sprenger worked as an acting manager for the entire region including Toledo, and that he took on managerial responsibilities whenever Boston Scientific's regional manager was absent. Sprenger, on the other hand, insisted that he never held the title of manager, was never promoted to a managerial position, never treated as a manager, and never given the benefits conferred on a manager while he worked at Boston Scientific. Sprenger apparently was willing to abandon that fight in agreeing to Paragraph 7, which extends the non-compete to the Toledo accounts, and presumably he did so because he obtained something else of benefit in return. The benefit he obtained was the inclusion of the language that the non-compete's restriction does not apply at all to his ability to engage in AF-related sales activities. This compromise indicates that the purpose of the Settlement Agreement was not *only* to protect Boston Scientific's interests; Boston Scientific's one-sided view fails to capture the full extent of the parties' intent.

  Boston Scientific also argues that interpreting Paragraph 7 to allow Sprenger to engage in AF-related sales work when there is an overlap with CRM issues would rewrite the non-compete. Boston Scientific insists that such an

14

interpretation would in effect strike the language restricting Sprenger from "support[ing] the sale or supervis[ing] the sale or implantation or other use of, or otherwise hav[ing] any involvement whatsoever with the sale, manufacturing, research and development, marketing or other business aspect" of any CRM device. (Pl.'s Reply 6.) Boston Scientific thus invokes the principle that in interpreting a contract a court must give effect to all the contract's terms. *See Brookfield Trade Ctr., Inc. v. Cnty. of Ramsey*, 584 N.W.2d 390, 394 (Minn. 1998) ("[W]e are to interpret a contract in such a way as to give meaning to all of its provisions."). But interpreting the contract according to Boston Scientific's view would, itself, fail to give effect to all the contract's terms. It would redline the language that permits him to engage in all aspects of AF-related sales work. And contrary to Boston Scientific's argument, the Court's interpretation does not render the restriction on Sprenger's CRM-related conduct a nullity. Sprenger obviously cannot attend any event for the purpose of promoting or selling St. Jude's CRM devices to the restricted Boston Scientific accounts. He also cannot attend an event that exclusively deals with CRM matters under the pretext that he is doing so to cross-promote AF devices. But what the Settlement Agreement allows him to do is attend an event that has a legitimate link to his AF-related sales work even though there is some overlap with CRM issues.

With that in mind, the question then becomes when does Sprenger's attendance at a specific promotional event cross the line from permissible AF-related conduct to prohibited involvement with CRM business. On the record

15

here, the Court cannot definitively draw that line for the parties or resolve all the possible disputes of this nature that may arise under the Settlement Agreement. But the record does provide a sufficient basis to conclude that Boston Scientific has failed to show Sprenger violated the Settlement Agreement by attending the Toledo or Austin events.

Boston Scientific argues that Sprenger was prohibited from attending the Toledo event because the very title of that presentation indicates that it was a CRM event. Boston Scientific thus insists that Sprenger could not legitimately have been there for the purpose of selling AF products and was necessarily there on a pretextual basis. (*See* PL.'s Mem. 6.) But this argument relies too heavily on the Toledo event's title that, in fact, mentioned a heart condition—i.e., heart failure—that everyone agrees can be treated with AF devices. Indeed, sometimes AF products are used in conjunction with CRM products as part of a course of treatment for a patient's heart problem. Other than indicating that the subject matter of the event would relate to an area where CRM and AF issues intersect, the title of the event tells us nothing about whether Sprenger's participation went beyond the permissible promotion of St. Jude's AF devices. And the unrebutted evidence in the record shows that he did not cross that line.

The same is true of Sprenger's attendance at the Austin event. Boston Scientific's own submissions to this Court show that Sprenger assiduously maintained a separation between his permissible AF-related sales work and involvement with CRM business. For example, Boston Scientific asserts that at

16

the Austin event, Sprenger attended seminars related to ablation (an AF treatment), and that he was only in the room with Dr. Ramicone when CRM topics were not being discussed and left the whenever a CRM topic came up. (Pl.'s Mem. 7.) As noted above, Defendants have presented unrebutted evidence that corroborates Sprenger's non-involvement with CRM business at the Austin event. Dr. Ramicone, who is an electrophysiologist working in the Cleveland area, has submitted an affidavit saying that he went to the Austin seminar because he was in the process of investigating the purchase of AF devices. It was obviously consistent with Sprenger's right to be involved in all aspects of AF sales for Sprenger, who was trying to sell St. Jude's AF products to Dr. Ramicone, to accompany him to Austin and to the seminar sessions about AF issues. There is no evidence, for instance, that Sprenger took this opportunity to pitch Dr. Ramicone on St. Jude's CRM products, or to help any other St. Jude salesperson make such a pitch. Nor is there any evidence that Sprenger did anything else to violate the non-compete on that trip.

Sprenger's behavior is consistent with the Court's interpretation of the Settlement Agreement. The reality of treating and diagnosing heart conditions with medical devices means that, in Sprenger's job, CRM and AF issues will sometimes overlap, and when they do, Sprenger must be careful to limit his activities to AF-related sales work. In the two instances that Boston Scientific claims Sprenger violated the Settlement Agreement, the record shows that he did exercise that care and stayed within the bounds of what his non-compete allows

17

him to do. For these reasons, the Court finds that Boston Scientific has failed to show any violation of the Settlement Agreement occurred.

III.   **CONCLUSION**

Paragraph 7 of the Settlement Agreement is ambiguous. The Court cannot provide the parties' with an exhaustive list of all the situations in which Sprenger's activities would be permitted or prohibited by the contract. Nevertheless, based on the record presented, the Court concludes that Boston Scientific has failed to show that Sprenger violated the Settlement Agreement by attending either the Toledo or the Austin event. Thus, Boston Scientific's Motion to Enforce the Settlement Agreement (Doc. No. 11), is **DENIED**.

**JJK**